# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| HEATHER BILLINGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  **CAUSE NO. 1:12-CV-184** |
| | ) |
| SOUTHWEST ALLEN COUNTY SCHOOLS | ) |
| SCHOOL CORPORATION, SWACS, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Heather Billings, a school bus driver, brings this suit against her former

employer, Southwest Allen County School Corporation ("SACS"), asserting that it terminated

her in March 2011 in retaliation and in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e-3, for reporting incidents of sexual harassment.[1]  SACS has moved

for summary judgment (Docket # 31), and the motion is now fully briefed (Docket # 32, 42-44,

48, 51, 52).

For the following reasons, SACS's motion for summary judgment will be DENIED.

## I. FACTUAL BACKGROUND[2]

SACS is an Indiana public school corporation serving Aboite and Lafayette Townships in

southwest Allen County. (Yager Aff. ¶ 3.)  It has one high school, two middle schools, six

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 13.)
    Initially, Billings also advanced a claim of sexual harassment, but the parties since stipulated to the dismissal of that claim. (Docket # 27, 28.)

[2] For summary judgment purposes, the facts are recited in the light most favorable to Billings, the nonmoving party. *Xiong v. Wagner*, 700 F.3d 282, 288 (7th Cir. 2012); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

elementary schools and approximately 6,900 students and 1,000 employees, 66 of which are regular school bus drivers. (Yager Aff. ¶ 3; Rarick Dep. 18.)  Most bus drivers drive two routes in both the morning and afternoon. (Rarick Aff. ¶ 3.[3])

### A. SACS Hires Billings as a School Bus Driver

SACS hired Billings as a substitute school bus driver in August 2000. (Billings Dep. 43, Ex. 8.[4])  She was later promoted to a regular bus driver and given a regular route. (Davis Aff. ¶ 4.[5])

In 2002, Phyllis Davis, SACS's Director of Human Resources, received a complaint from driver Laurel Hess that Billings elbowed her while walking through a door. (Davis Aff. ¶ 7.) Hess told Davis that she suspected Billings did so because Billings's sister, another school bus driver, was having an affair with Hess's husband. (Davis Aff. ¶ 7.)  Billings denied elbowing Hess, and Davis, at Hess's request, did not further investigate the matter. (Davis Aff. ¶ 7.)

In October 2003, Billings resigned from her position after having her third child. (Billings Dep. 50-52, Ex. 13.)  But SACS rehired her as a substitute bus driver in February 2004. (Billings Dep. 53-54, Ex. 14.)  She was later promoted to a regular bus driver and assigned to drive high school, middle, and elementary students to and from three schools. (Davis Aff. ¶ 5.)

---

[3] David Rarick has two Affidavits of record.  The first, dated June 23, 2013, is cited herein as "Rarick Aff. ¶ __" and the second, dated September 9, 2013, as "Rarick Aff. II ¶ __."

[4] Billings has two depositions of record.  The first, dated January 17, 2013, is cited herein as "Billings Dep. __" and the second, dated January 29, 2013, as "Billings Dep. II __."

[5] Davis has two Affidavits of record.  The first, dated June 24, 2013, is cited herein as "Davis Aff. ¶ __" and the second, dated September 9, 2013, as "Davis Aff. II ¶ __."

*B. A Group of Female Drivers Target Billings Throughout Her Employment*

After Billings began working for SACS, a group of female bus drivers began to talk badly about her, referring to her as "skinny bitch," "backstabber," and "whore." (Billings Aff. ¶¶ 10-15; Billings Dep. 286; Kuschel Aff. ¶¶ 3-8; Bricker Aff. ¶¶ 3-9; McKay Aff. ¶¶ 3-12; Ruch Aff. ¶¶ 2-13; Good Aff. ¶¶ 4-6; Treasa Linnemeier Aff. ¶¶ 11-17; Wayne Linnemeier Aff. ¶¶ 2-15.) These comments occurred "quite a bit," continuing up until Billings's termination in 2011. (Billings Dep. 225-26, 268, 286.) This group of drivers was led by Glenda Harmeyer, Phyllis Prezbindowski, Kathy Pleus, and Pat Boze. (Kuschel Aff. ¶ 4; McKay Aff. ¶ 5; Ruch Aff. ¶ 5; Good Aff. ¶ 5; Teresa Linnemeier Aff. ¶ 14; Wayne Linnemeier Aff. ¶ 8.) At some point, several other drivers, including Sam Bennage, began to join in. (Billings Aff. ¶ 11; Ruch Aff. ¶ 5.)

The group said Billings was too flirtatious, did not act the way a lady should properly act, and that she had extramarital affairs with male drivers. (McKay Aff. ¶ 8; Kuschel Aff. ¶ 8; Good Aff. ¶ 6.) Specifically, false rumors were spread that she was having an affair with driver Bill Ruch,[6] and then several years later, with driver Tom Carteaux. (Billings Dep. 176-78, 267-68, 365-66; Billings Aff. ¶ 35.) In fact, when Billings became pregnant with her fourth child, the group openly speculated around other employees whether the baby was her husband's or Ruch's. (McKay Aff. ¶ 10.) And after she gave birth, someone put a greeting card in Ruch's work mailbox congratulating him on the birth of his new baby. (Ruch Aff. ¶ 9.) The group also criticized Billings's size, appearance, and personal behaviors. (Bricker Aff. ¶ 9; McKay Aff. ¶ 8;

---

[6] Billings admits that she was friends with Ruch and spent a considerable amount of time with him at work; they would park near each other and sit in each other's cars and talk, rather than in the drivers' lounge. (Billings Dep. 170-71; Billings Dep. II 21-22.)

Kuschel ¶ 7.) When Billings missed work due to illness, they accused her of "giving favors to her doctor to get time off work." (Good Aff. ¶ 6.) These drivers gave Billings dirty looks that other drivers could see; made snide remarks; and unfairly criticized her driving, including falsely accusing her of speeding, backing up improperly, pulling out around other buses, and otherwise violating safety rules. (Billings Dep. 368; Billings Aff. ¶¶ 12-13, 24; Michael Billings Aff. ¶¶ 3-8.)

Billings was aware of the rumors and believed that this group was falsely characterizing her as the "whore of transportation"; she would frequently go home crying and complain about the group to her husband. (Billings Aff. ¶¶ 12-14; Michael Billings Aff. ¶¶ 3-8.) Billings told her husband that she believed she was being sexually harassed at work. (Michael Billings Aff. ¶ 7.) Billings perceived that the purported harassment worsened after it became publicly known that her sister had an affair with Hess's husband. (Billings Dep. 362-63.)

The purported harassers encouraged others, both male and female, to dislike and criticize Billings.[7] (McKay Aff. ¶ 5; Ruch Aff. ¶ 5.) They also targeted other female drivers.[8] (Bricker Aff. ¶¶ 6-10; McKay Aff. ¶¶ 13-14; Kuschel Aff. ¶¶ 9-12.) The group, however, generally did not target male drivers. (Bricker Aff. ¶¶ 6-10; McKay Aff. ¶¶ 13-14; Kuschel Aff. ¶¶ 9-12.) One

---

[7] For example, when Billings attempted to politely talk with driver Dan Sword after he drove by her bus when the "stop arm" was up, he responded that she was "nothing but a bitch." (Billings Aff. ¶ 16; Billings Dep. 252-55.) When asked why he would say such a thing when they did not know each other well, Sword said that he heard it in the drivers' lounge "quite often." (Billings Aff. ¶ 16; Billings Dep. 252-55.) On another occasion, employee Karen Cross told Billings, who was talking with Ruch at the time, "shame on you, you're nothing but a bad person." (Ruch Aff. ¶ 8; Billings Dep. 263.) Billings also heard from her students that her substitute bus driver, Sharon Dosner, was talking bad about her to her students. (Billings Dep. 255.)

[8] For example, the group gossiped about driver Pamela Bricker after her divorce, commenting on the number of men that she dated and calling her a "sleeze [sic]." (Kuschel Aff. ¶ 9; McKay Aff. ¶ 6.) They also criticized driver Donna Paul's clothing, called her "rough," and accused her of reckless driving. (Kuschel Aff. ¶ 10; McKay Aff. ¶ 6.)

exception was that they targeted Ruch, but only after he became friendly with Billings and defended her. (Ruch Aff. ¶¶ 12-13; Kuschel Aff. ¶¶ 11-12; McKay Aff. ¶¶ 5-6; Bricker Aff. ¶¶ 9-10.)  For example, Prezbindowski told Ruch: "[Y]ou have your head up Heather's ass and Heather is going to bring you down."[9] (Ruch Aff. ¶ 13.)

Three of the purported harassers—Harmeyer, Prezbindowski, and Boze— were on the Bus Drivers Committee, which met monthly with the Director of Transportation to discuss issues and problems. (Rarick Dep. 117-20, Ex. 3.)  Ike Doll served as the Director of Transportation until July 2010, at which point David Rarick became the Director. (Billings Dep. 55-57; Rarick Dep. 1-2.)  At some point, the Bus Driver's Committee specifically complained to Rarick about Billings, stating that she should have been fired "a long time ago." (Rarick Dep. 117-20, Ex. 3.)  Throughout 2010 and 2011, Prezbindowski, in particular, talked daily with Rarick behind closed doors. (Billings Aff. ¶ 43.)

### C.  Billings Receives a "Written Notice of Excessive Absence" in October 2007

In October 2007, Doll issued Billings a "Written Notice of Excessive Absence," informing her that she would be terminated if she incurred another unexcused absence within two months. (Billings Dep. 63, Ex. 18.)  Billings did not incur an unexcused absence in those two months. (Billings Dep. 64; Billings Aff. ¶¶ 7-8.)  Billings never received further discipline from SACS due to her attendance.[10] (Billings Aff. ¶ 8.)

---

[9] Another driver asked Ruch where he and Billings went when they left together each morning, and asked Billings if she and Ruch went to hotels together. (Ruch Aff. ¶ 7; Billings Dep 205-06.)

[10] Davis represents that at some point Billings did indeed exceed the number of allowable absences and Doll wanted to terminate her, but Davis recommended she be retained. (Davis Aff. ¶ 12.)  Davis, however, does not point to any documentation from Billings's personnel file to support this.

*D. In December 2007 Billings Complains to Davis That She Is Being "Sexually Harassed"*

On December 6, 2007, Billings confronted Boze and Harmeyer in the parking lot of the transportation building about a statement Boze made on the fleet's radio after a student was late to Billings's bus.[11] (Billings Dep. 188-89.) Harmeyer then repeatedly screamed that Billings was Ruch's lover, that she was "sick of [Billings] and her lover's crap," and that she would do everything she could to get Billings fired. (Davis Aff. ¶¶ 8-9, Ex. B; Davis Dep. 188, Ex. 6; Billings Dep. 195-98; Billings Dep. II 19-20.) Billings was particularly upset that Harmeyer screamed this false rumor—several times—in front of Billings's nine-year-old son, who was in the car with her at the time. (Billings Dep. 197-98; Davis Dep. 168, Ex. 6.)

Billings reported the incident to Doll and Davis, complaining it was "sexual harassment." (Billings Dep. 235-37; Davis Aff. ¶ 8.) Davis then interviewed Billings, Boze, and Harmeyer; concluded it was a "personnel disagreement" and not sexual harassment; and gave them all verbal warnings. (Davis Aff. ¶ 10.) Davis, however, wrote at the end of her notes pertaining to Billings's allegations to "schedule sexual harassment training." (Davis Dep. 197-99, Ex. 6.) Davis then subsequently conducted sexual harassment training for all bus drivers.[12] (Billings Dep. 213-15; Billings Aff. ¶ 22; Davis Dep. 197-99, Ex. 5.)

*E. The Sick Leave Bank Issue in 2008*

In November 2008, Billings was unable to work for a period of time due to vertigo. (Billings Dep. 134-40, Ex. 36.) She sought paid leave from the Sick Leave Bank, a driver-

---

[11] Harmeyer, who witnessed the incident, told Davis that Billings drove her car in a circle around Boze as she walked through the parking lot (Davis Aff. ¶¶ 8-9), but Billings denied doing so (Billings Dep. 196-96).

[12] Davis now denies that she conducted "sexual harassment" training, asserting it instead was "anti-harassment training." (Davis Aff. ¶ 10.)

created entity that collected unused sick days from drivers and gave them to other drivers who had exhausted their paid leave. (Billings Dep. 65-67, 134-36, Ex. 36.) A Committee of three drivers, one of which was Prezbindowski, considered these requests for leave. (Billings Dep. 65-67, 134-37, Ex. 36.) The Committee denied Billings's request, but Prezbindowski refused to write a reason for the denial on Billings's request form. (Billings Dep. 134-40, Ex. 36.) Prezbindowski verbally accused Billings of abusing the system when she used the Bank for her 2003 maternity leave and then promptly resigned her employment, negating any obligation to pay the leave back.[13] (Billings Dep. 138-41; Billings Aff. ¶ 29.) Billings complained to Davis about the denial, and the Committee reversed its decision and granted Billings paid leave for her vertigo.[14] (Billings Dep. 136-36, 162, 165; Billings Aff. ¶ 34; Davis Aff. ¶ 11.)

### F. Billings Is Placed on "Open" Probation for Using a Cell Phone While Driving Her Unloaded Bus in March 2009

In March 2009, Billings was suspended without pay for one day after using a cell phone while driving her unloaded school bus. (Billings Dep. 67-70 Exs. 19, 20; Billings Aff. ¶ 9.) Doll

---

[13] Similarly, Billings's request to the Bank for maternity leave in 2007 was denied. (Billings Dep. 300-01, Ex. 41.) At the time Prezbindowski told her that she had been put on "sick bank probation," but Billings did not know what that meant. (Billings Dep. 300-01.) Billings also suspected that Prezbindowski was the author of an anonymous note in her mailbox telling her not to take soda from the refrigerator in the drivers' lounge without paying for it. (Billings Dep. 180-82, Ex. 44; Billings Dep. II 53-54.)

[14] At some point thereafter, Billings, Ruch, and another driver, Wayne Linnemeier, drafted flyers critical of the Sick Leave Bank Committee and put them in the drivers' mailboxes in the drivers' lounge. (Billings Dep. 142-45; Teresa Linnemeier Aff. ¶¶ 19-26; Wayne Linnemeier Aff. ¶¶ 17-24.) They felt the Committee was subjectively denying requests for leave. (Billings Dep. 142-45.) One of the flyers read, in part, "If the Sick Bank Committee is hormonal when your request comes thr[ough] they can deny you." (Billings Dep. 143, 146-48, Ex. 37.) Billings admitted that "a lot of the drivers turned against" her, Ruch, and Linnemeier after that. (Billings Dep. 151.)

After helping Billings organize a meeting of the drivers regarding the Sick Leave Bank, Treasa Linnemeier received an anonymous call from someone who said, "You should have stayed out of this it is not your fight." (Treasa Linnemeier Aff. ¶¶ 23-26.) Treasa Linnemeier told Davis of this harassment in an email dated December 4, 2008, specifically attributing the actions of the Sick Leave Bank Committee to "sexual harassment" directed at Billings and Ruch. (Treasa Linnemeier Aff. ¶¶ 27-27; Ex. C.) Linnemeier told Davis that she believed she and her husband Wayne were being harassed because they stood up for Billings. (Treasa Linnemeier Aff. ¶¶ 26-29, Ex. C.)

placed Billings on "open" or "permanent" probation, instructing her that any future safety violations could result in her termination. (Billings Dep. 68-71, 345-46, Ex. 19.)  Billings signed a document acknowledging the violation and probation. (Billings Dep. Ex. 19.)

### G.  In September 2010 Billings Complained to Rarick of "Sexual Harassment"

On September 3, 2010, shortly after he became the Director of Transportation, Rarick called in Billings and told her that her probation would continue under his supervision; he then wrote a memo to her documenting the same, which he placed in her file but never gave her. (Billings Dep. 67-69, Ex. 20.)  Near that same time, Rarick asked Billings to complete a self-assessment of her job performance in preparation for her October 2010 evaluation. (Billings Aff. ¶ 39.)  There is no evidence that he asked other drivers to complete a self-evaluation or reminded a driver, other than Billings, that he or she remained on probation.[15] (Billings Aff. ¶ 40.)

In September 2010, Billings learned from driver Tom Carteaux that there was a rumor circulating the two were having an affair. (Billings Dep. 176-78, 267-68, 365-66; Billings Aff. ¶ 35.)  Billings then complained to Rarick about the rumor and also that she had been "sexually harassed" at work for years. (Billings Dep. 346-47; Billings Aff. ¶¶ 35-37.)  Rarick asked Billings why she let such things bother her and encouraged her to approach the person who was spreading the rumor.[16] (Billings Dep. 347; Billings Aff. ¶¶ 35-37.)

---

[15] Rarick contends that Billings was one of the first drivers he asked to complete a self-assessment after he became the Director. (Rarick Aff. ¶ 3.)  He explains that he promptly discontinued the practice because the assessments ultimately were not very helpful. (Rarick Aff. ¶ 3.)

[16] Rarick, however, does not particularly recall that Billings ever complained about a rumor of an affair with Carteaux and denies that she used the term "sexual harassment" in any of her complaints. (Rarick Dep. 116, 184-86.)

*H. Rarick Counsels Billings Concerning the Length of Her Shorts in September 2010*

In September 21, 2010, Rarick received a report that Billings wore inappropriately short shorts to work, causing students to linger in front of her bus. (Rarick Dep. 204-06, Ex. 11.) Rarick then talked to Billings about the length of her shorts and instructed her to dress appropriately, but did not tell her that she was being disciplined. (Billings Dep. 71-75, Ex. 21.) He documented the discussion for her file. (Rarick Dep. 204-06, Ex. 11.) Billings had worn these shorts to work on prior occasions and talked with Rarick while wearing them, but he had never previously mentioned them. (Billings Aff. ¶ 53.)

*I. In October 2010 Rarick Belatedly Documents a "Verbal Warning" to Billings's File*

At some point prior to July 2010, Doll told Billings not to sit on the dash of Ruch's bus, stating that it set a bad example for students, and that she should wait for students on her own bus. (Billings Dep. 68-70, 76-81, 351-53, Ex. 22; Rarick Dep. 203-04, Ex. 10.) But Billings had often seen other drivers, including Prezbindowski, sit on dashboards between routes and was unaware it was prohibited. (Billings Dep. 351-53.) In fact, she continued to see other drivers sit on dashes after October 2010 and never heard of another driver being counseled for it. (Billings Dep. 351-53.) Doll never told her she was being disciplined or "verbally warned" at the time. (Billings Aff. ¶¶ 51-52.) Billings never sat on a bus dash again. (Billings Aff. ¶ 52.)

But on October 19, 2010, three months after Doll had retired, Rarick placed a memo in Billings's file documenting a "Verbal Warning" about sitting on the dash. (Rarick Dep. 1-2, 203-04, Ex. 10; Davis Dep. 65.) Rarick does not recall how he learned that Billings was sitting on the dash of Ruch's bus, but thought it was possible that another driver had told him. (Rarick Dep. 204.)

*J. Billings Radios Rarick for Assistance in November 2010*

On November 17, 2010, Billings had difficulty maintaining control of her students during an afternoon route, and, consistent with SACS's training, she radioed Rarick and requested his assistance. (Billings Dep. 82-88, 339-40.) She reported that the students on her bus were misbehaving so she had pulled off the road to attempt to regain control, but was unsuccessful. (Billings Dep. 82-88.) Rarick immediately drove to Billings's bus and regained control of the students. (Billings Dep. 82-88.)

Rarick met with Billings the following day to discuss the incident. (Billings Dep. 88-90.) During the meeting, Rarick gave Billings a memo that stated they "need[ed] to work to get this bus back in order," instructed her to write up students if they stood up while the bus was moving, and strongly recommended she assign seats for students. (Billings Dep. 82, 88-90, Ex. 23.)

*K. In January 2011 Billings Again Complains Again to Rarick About "Sexual Harassment"*

In January 2011, Rarick received a report from another bus driver, Sam Bennage—who served on the Bus Committee and was friendly with Harmeyer, Boze, and Prezbindowski (Billings Aff. ¶ 48)—that Billings had flipped him "the finger," supposedly because Bennage was abiding by the speed limit in the parking lot but Billings wanted him to go faster. (Rarick Dep. 236-37, Ex. 13.) Billings adamantly denied the allegation and told Rarick that it was part of the "sexual harassment" that had been going on for years and that the harassing group was trying to get her fired.[17] (Billings Dep. 354-56; Billings Aff. ¶¶ 46-47.) Billings then provided Rarick with a list of drivers who she asserted were "targeting" her for "sexual harassment." (Rarick Dep. 93-95, 185-86, 209-12, Ex. 13; Billings Aff. ¶¶ 46-47; Billings Dep. 90-91, 93-98,

---

[17] Rarick denies that Billings ever complained of "sexual harassment," asserting instead that she said other drivers were "out to get [her]." (Rarick Aff. ¶ 9; Rarick Dep. 185-86.)

354-56, Ex. 25; Rarick Aff. ¶ 9.)

Given the discrepancy between Bennage's and Billings's reports, Rarick chose not to discipline Billings for the incident. (Rarick Dep. 93-95, 239-43; Rarick Aff. ¶ 9.)  He did, however, document for his file that he discussed the incident with Billings. (Rarick Dep. 236, Ex. 13; Rarick Aff. ¶ 9.)  He also sent an email to Davis about the incident. (Rarick Dep. 93-95, 185-86, 209-12, Ex. 13; Davis Dep. 284-89, Exs. 17, 27.)  He did not investigate Billings's complaints. (Rarick Dep. 95, 114.)

*L.  In March 2011 SACS Terminates Billings's Employment*

Two months later, in March 2011, Patricia Bultemeier, a cafeteria worker at one of the schools on Billings's route, told her supervisor that she had repeatedly seen students standing on Bus 44 when it pulled into the school each morning. (Bultemeier Aff. ¶¶ 2-3.)  Bultemeier's duties included letting students into the cafeteria each morning, so she regularly watched the buses enter the parking lot. (Bultemeier Aff. ¶ 2.)  Bultemeier did not know who drove Bus 44 (Bultemeier Aff. ¶ 5); Billings admits she did not know Bultemeier and had no reason to believe that Bultemeier had a vendetta against her (Billings Dep. 106).

Bultemeier's observations were passed along to the school principal, who told Rarick. (Bultemeier Aff. ¶ 4; Rarick Dep. 36.)  Rarick then reviewed the video recordings from Bus 44 and saw that many of Billings's elementary students stood and walked up and down the aisle while the bus was moving. (Rarick Aff. ¶ 12; Rarick Dep. 36.)  The tape showed that Billings occasionally asked them to sit down. (Rarick Aff. ¶ 12.)

On March 10, 2011, Rarick and Davis met with Billings about the issue, and Billings admitted that students stood on her bus while it was moving at least once a week. (Billings Dep.

11

105; Billings Dep. II 160; Rarick Aff. ¶ 13; Davis Aff. ¶ 14.)  Rarick asked her if she had implemented the suggestions and disciplinary policies he had discussed with her in November; Billings responded that she had not asked the students to get up and move around, and when she did ask them to sit down, they refused. (Rarick Aff. ¶ 13; Davis Aff. ¶ 14.)  She admitted that she had not logged anything on her contact log and had not yet assigned seats to students.[18] (Billings Dep. 111, 130; Rarick Aff. ¶ 13; Davis Aff. ¶ 14.)  At the conclusion of the meeting, Rarick and Davis suspended Billings without pay pending further investigation. (Rarick Aff. ¶ 13; Davis Aff. ¶ 14.)

Rarick and Davis decided to recommend to Superintendent Steve Yager that SACS terminate Billings's employment. (Davis Aff. ¶ 15; Rarick Aff. ¶¶ 14, 16.)  They contend that they did so because Billings willfully ignored Rarick's November instructions and thus it was unlikely her performance would improve if they counseled her again (Davis Aff. ¶ 15; Rarick Aff. ¶ 14; Davis Dep. 536-37); Davis stated that she perceived Billings as insubordinate (Davis Dep. 536-37, Ex. 8).

Yager agreed with Rarick's and Davis's recommendation to terminate Billings. (Yager Aff. ¶ 5.)  At the time he made that decision, Yager did not know that Billings had complained of "sexual harassment" or false rumors of affairs. (Yager Aff. ¶ 7.)  At a public meeting that evening, the Board unanimously voted to immediately terminate Billings's employment. (Yager Aff. ¶ 6.)  The Board members were also unaware that Billings had complained of "sexual harassment" or false rumors of affairs. (Blum Aff. ¶ 5; Gilpin Aff. ¶ 5; Loomis Aff. ¶ 5.)  Davis

---

[18] Billings did, however, write up one student in January 2011, but cannot recall if she told Rarick and Davis this at the meeting, explaining that she was caught off guard by the meeting and thus "really [could not] remember a whole lot of [it]." (Billings Dep. 113, 115, 123.)

then sent Billings a letter informing her of the Board's decision. (Billings Dep. 119, Ex. 31.)

*M. Billings Had a Clean Driving History During Her Ten-Year Employment With SACS*

Billings never had an accident or received a traffic citation while driving the bus for SACS from 2000 to 2011. (Billings Aff. ¶ 42.) Four "Evaluation and Observation Summary" documents were in her file: three completed by Doll after ride-alongs in September 2000, February 2001, and October 2006, and one completed by Rarick in September 2010. (Billings Aff. ¶ 4, Exs. A-D.) None of the evaluations indicated that Billings needed additional instruction in student management or that she was inadequately performing her job. (Billings Aff. ¶ 4, Exs. A-D.) The 2006 and 2010 summaries did reflect that she had a tendency to start moving before students were seated and reminded her to make sure all students were seated during the route. (Billings Aff. ¶ 4; Exs. C, D.) The 2010 summary also indicated that she needed to finalize her elementary seating chart. (Billings Aff. ¶ 4, Ex. D.)

## II.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must

construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### III. DISCUSSION

*A. Applicable Law*

A plaintiff alleging retaliation under Title VII can contest summary judgment by using either the direct or indirect method of proof. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013); *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). "The direct method requires proof that (1) the employee engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two."[19] *Majors*, 714 F.3d at 537; *accord Benuzzi*, 647 F.3d at 664; *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011).

"The indirect method requires proof that (1) the employee engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Majors*, 714 F.3d at 537; *accord Silverman*, 637 F.3d at 742. If she establishes these elements, the burden shifts to the defendant

---

[19] "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 548 (7th Cir. 2011) (citation omitted). "This type of evidence requires an admission by the decision-maker that her actions were based upon the prohibited animus." *Id.* (citation and internal quotation marks omitted). "A plaintiff may also establish [her] direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decisionmaker." *Id.*

to produce a legitimate, non-retaliatory reason for taking the adverse employment action. *Majors*, 714 F.3d at 539; *accord Silverman*, 637 F.3d at 742. If it succeeds in doing so, then the plaintiff must come forward with evidence that the defendant's proffered reasons were only a pretext for retaliating against her. *Majors*, 714 F.3d at 539; *accord Silverman*, 637 F.3d at 742.

### B. Billings's Retaliation Claim Survives Under the Direct Method

Billings proceeds under the direct method of proof by attempting to construct a "'convincing mosaic' of circumstantial evidence" from which a jury could infer intentional discrimination by the decision maker. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Under the convincing mosaic approach, a retaliation case can "be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Coleman v. Donahue*, 667 F.3d 835, 862 (7th Cir. 2012) (citation and internal quotation marks omitted).

SACS concedes that Billings suffered an adverse employment action, but disputes that she can establish the first and third elements—that she engaged in protected activity and that retaliation caused her termination. Ultimately, when viewing the record and all reasonable inferences drawn therefrom in the light most favorable to Billings, she produces just enough evidence to survive summary judgment.

### 1. Billings Engaged in Protected Activity

To establish that she engaged in protected activity, Billings must show that she "had a reasonable belief that a Title VII violation occurred" when she complained to SACS. *Pasqua v.*

15

*Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (citation and internal quotation marks omitted). That is, she must show that she had a "sincere and reasonable belief" that she was opposing sexual harassment. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000); *see also Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 674 (7th Cir. 2011); *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008); *Pasqua*, 101 F.3d at 517; *Jennings v. Tinley Park Cmty. Consol. Sch. Dist. No. 146*, 796 F.2d 962, 967 (7th Cir. 1986). This requirement "is not onerous." *Leitgen*, 630 F.3d at 674. Billings "simply ha[s] to show that her belief that she was complaining about unlawful discrimination was not 'completely groundless.'" *Id.* (citation omitted).

Billings asserts that she complained to SACS three times—in December 2007, September 2010, and January 2011—that she was being "sexually harassed." (Billings Dep. 235-37, 346-47, 354-56; Billings Aff. ¶¶ 19, 35-37, 46-47.) SACS contends, however, that Billings's complaints were only of rumors circulating that she and a male co-worker were involved in a sexual relationship, which affected both Billings *and* a male co-worker and thus were inflicted without regard to gender.

Indeed, "[h]arassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is not actionable because the harassment is not based on sex." *Venezia v. Gottlieb Mem'l Hosp., Inc.*, 421 F.3d 468, 471 (7th Cir. 2005) (quoting *Pasqua*, 101 F.3d at 517). Rumors of a sexual relationship between co-workers can "spread, irrespective of truth, for any number of reasons having nothing to do with gender discrimination." *Pasqua*, 101 F.3d at 517; *see, e.g.*, *Reiter v. Oshkosh Corp.*, No. 09-C-239, 2010 WL 2925916, at *6 (E.D. Wis. July 22, 2010); *Coughlin v. Wrigley Mfg. Co., LLC*,

No. 02 C 7849, 2004 WL 1064735, at *8 (N.D. Ill. May 7, 2004). But the Seventh Circuit Court of Appeals has acknowledged that it is conceivable that "someone might spread slanderous rumors in the workplace for the simple motivation that someone else was of a particular gender." *Pasqua*, 101 F.3d at 517.

Billings's first complaint to SACS was in December 2007 following the parking lot incident where Harmeyer repeatedly screamed in front of Billings's young son that Billings was having an affair with Ruch. Billings reported the incident to Doll and Davis, complaining it was "sexual harassment." (Billings Dep. 235-37; Davis Aff. ¶ 8.) SACS contends, however, this was not protected activity because Billings's belief that the rumors constituted sexual harassment was not reasonable, *Pasqua*, 101 F.3d at 518, since the rumors affected *both* Billings and Ruch.

But the evidence suggests that Ruch was harassed by other drivers only after he befriended and defended Billings. (Ruch Aff. ¶¶12-13; Kuschel Aff. ¶¶ 11-12; McKay Aff. ¶¶ 5-6; Bricker Aff. ¶¶ 9-10.) That is, there is no evidence that Ruch was referred to by sexual epithets or criticized for flirtatious behavior, manner of dress or appearance, or the number of women he dated. (Ruch Aff. ¶¶12-13; Kuschel Aff. ¶¶ 11-12; McKay Aff. ¶¶ 5-6; Bricker Aff. ¶¶ 9-10.)

In contrast, there is ample evidence that the drivers—and Harmeyer in particular—regularly referred to Billings as a "skinny bitch," "bitch," and "whore" and criticized her appearance, the way she dressed, her supposed flirtatious behavior, and her relationships with men. (Billings Dep. 225-26, 268, 286; Billings Aff. ¶ 12; Kuschel Aff. ¶¶ 6-8; Bricker Aff. ¶¶ 7, 9; McKay Aff. ¶¶ 6-8; Good Aff. ¶ 6; Treasa Linnemeier Aff. ¶ 12.) There is also evidence that the group targeted, at least to some extent, two other females, Bricker and Paul, criticizing Paul's

appearance and referring to Bricker as a "sleeze [sic]." (Kuschel Aff. ¶ 9; McKay Aff. ¶ 6.) "Unfounded accusations that a woman worker is a 'whore,' a siren, carrying on with her coworkers, a Circe, 'sleeping her way to the top,' and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman, they could constitute a form of sexual harassment." *McDonnell v. Cisneros*, 84 F.3d 256, 259-60 (7th Cir. 1996) (citations omitted). In fact, in response to Billings's complaint in December 2007, Davis noted "to schedule sexual harassment training" and then actually conducted sexual harassment training. (Billings Dep. 213-15; Davis Dep. 197-99, Ex. 6.)

And this was not Billings's only complaint. In September 2010, Billings complained to Rarick not only of the false rumor circulating that she was having an affair with Carteaux, but also about the 2007 incident and "*the harassment of [her] since then.*" (Billings Aff. ¶ 36 (emphasis added); *see also* Billings Dep. 364 (stating that she told Rarick "what had happened to [her over] the years because [Rarick] had only worked there for eight months to let him know that this wasn't the first time that sometime like this happened").) Billings complained to Rarick that the behavior was "sexual harassment" and that it "had been going on for years." (Billings Aff. ¶¶ 36.) There is no evidence of record that Carteaux was ever harassed by drivers.

Then, in January 2011, just two months before her termination, Billings again complained to Rarick of "sexual harassment" in response to Sam Bennage's accusation that she gave him "the finger." (Billings Dep. 354-55; Billings Aff. ¶¶ 87-90.) This time Billings went even further—she gave Rarick a list of the drivers' bus numbers who purportedly were targeting her for "sexual harassment" and were trying to get her fired. (Billings Dep. 354-55; Billings Aff.

¶¶ 46-47.)  She told Rarick that Bennage's accusation was "part of the sexual harassment that had been going on for years . . . ." (Billings Aff. ¶ 46.)

Again, SACS tries to divorce Billings's January 2011 complaints from her gender, attributing the harassment to Billings's purported abuse and attempted overhaul of the Sick Leave Bank, her confrontive personality, her failure to pay for soda, and the alleged affair of her sister.  But the Court must, at this stage, view all of the evidence in the light most favorable to Billings and draw all reasonable inferences in her favor. *Xiong*, 700 F.3d at 288.  Billings's "claim of harassment need not be viable by itself." *Baker v. Pro Floor, Inc.*, No. 04-C-0157-C, 2005 WL 79010, at *4 (W.D. Wis. Jan. 6, 2005) (citations omitted).  Rather, Billings need only demonstrate a  "reasonable belief" that she was challenging conduct that violates Title VII. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).  The Seventh Circuit explained in *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004), that its "decision sets a low bar for receiving Title VII protection."  "Protection is not lost simply because an employee is mistaken on the merits of his or her charge." *Id*.  "Protection also is not lost if an employee [makes] a complaint as best . . . she can but does not state an effective legal claim." *Id.*

Considering the long litany of accusations that Billings was regularly subjected to, which were based on the fact that she was a woman, Billings held, at least with respect to the September 2010 and January 2011 complaints, a "sincere and reasonable belief" that she was opposing an unlawful practice when she complained to SACS of sexual harassment. *Hamner*, 224 F.3d at 706-07.  Thus, she has satisfied the first element of her retaliation claim for purposes of summary judgment.

### 2. A Convincing Mosaic of Circumstantial Evidence Points to Retaliation as the Cause of Billings's Termination

When proceeding under the direct method of proof through producing circumstantial evidence, the "circumstantial evidence must be strong enough, taken as a whole, to allow the trier of fact to draw the necessary inference." *Morgan v. SVT, LCC*, 724 F.3d 990, 995 (7th Cir. 2013). "Typical kinds of evidence used for this purpose include (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. at 995-96.

A plaintiff advancing a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013). Here, Billings constructs a mosaic of circumstantial evidence that she contends supports an inference that retaliation was the "but-for" cause of her termination. *Nassar*, 133 S.Ct. at 2534. Ultimately, Billings's arguments and evidence are enough, albeit just barely, to survive summary judgment.

#### a. Similarly-Situated Individuals

Most compelling in Billings's mosaic is evidence that similarly-situated drivers who did not complain of sexual harassment were treated more favorably. In the usual case, a plaintiff must show "that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Donahoe*, 667 F.3d at 847 (citations and internal quotation marks omitted). "So long as the

distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied." *Id*. at 846 (citation and internal quotation marks omitted).

"In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." *Id*. at 850 (quoting *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010)). "Comparators must have engaged in similar—not identical—conduct to qualify as similarly situated." *Id.* (citation and internal quotation marks omitted). "To determine whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Id.* (citation and internal quotation marks omitted).

Billings emphasizes that there is *no* evidence that SACS ever terminated any driver, other than her, for failing to discipline students for standing up on the bus. (Billings Aff. ¶¶ 67-68; Kuschel Aff. ¶ 13; Ruch Aff. ¶ 19; Good Aff. ¶ 16; Reinking Aff. ¶ 12.) In that vein, she points to four potential comparators—drivers Don Patane, Cheryl Good, Timothy Lawhead, and Timothy Harpel—who had the same supervisors and were subject to the same rules, but received lesser discipline for similar, or even more serious, misconduct.

1. Don Patane

In March 2012, Patane was issued a written warning for being in an accident and failing to report it; the warning reflected that this was his fifth accident, and his third accident within the last thirteen months. (Pl.'s Designation of Materials Ex. 14.) Six months later, in September 2012, Rarick issued Patane a "probationary warning" when the video from his bus camera

showed "many students standing, moving from seat to seat and disregarding safety while the bus is in motion," culminating in a student injury when the bus stopped quickly. (*Id.*) The warning indicated that Patane "admitted that [he] ha[d] not written up any bus incident reports this school year, even though students violated safety procedures" and had not asked Rarick "to assist [him] in getting [his] students seated." (*Id.*) Patane was given an opportunity to ride as a monitor on his bus in order to teach the students the correct safety procedures and was required to outline the proper methods for student riding. (*Id.*)

Thus, SACS retained Patane after he had failed to write up students for standing up on the bus—the same conduct as Billings—even though he previously had five accidents. Patane retired three months after he was placed on probation, but then was rehired as a substitute bus driver in February 2013. (*Id.*) Within two months Patane had his sixth accident, and he resigned his employment. (*Id.*)

## 2. Cheryl Good

In March 2005, while still in her trial period, Good had two minor accidents and left her bus with students on board. (*Id.* at Exs. 16-19.) SACS then extended her trial period by thirty days. (*Id.*) Two months later, in May 2005, Good was issued a written warning for her failure to appropriately manage and supervise the students on her bus. (*Id.*) The warning reflected that her "behavior must reflect immediate improvement and remain satisfactory hereafter to avoid further disciplinary actions up to and including termination." (*Id.*)

Two years later, in October 2007, Good received another write up after a student was taken to the hospital for an injury; the write up reflected that Good failed to follow safety procedures, failed to make sure all students were seated, and caused a student to be injured. (*Id.*)

Good was instructed that if a similar situation occurred again, she would be suspended from driving a route or trips until she was recertified through additional training and driving. (*Id.*) In October 2010, Good was late to work and failed to "pre-trip" her bus; she was given a verbal warning, documented by a memo, that she would receive a written warning the next time. (*Id.*)

In May 2011, Good was written up for an accident, which occurred when she was distracted by students and exhibited a "lack of concentration"; Rarick informed her that if a similar situation occurred, she may be suspended from driving a route or trips until she was recertified through additional training and driving. (*Id.*) Two weeks later, Good had another accident when she was "engaged in a conversation with a student in the front row" and hit the back of another bus with her mirror; two students received minor injuries. (*Id.*) Good did not report the accident and claimed that it did not occur. (*Id.*) As with Patane, Rarick did not terminate Good's employment, but instead issued her a "probationary warning," suspended her without pay for three days, and provided additional training on defensive driving and student management. (*Id.*)

Four months later, Good received a written warning for failing to show up at work or call in. (*Id.*) Finally, after she was tardy yet again in January 2012 and failed to pre-trip her bus, Good resigned her employment in lieu of termination. (*Id.*)

3. Timothy Lawhead

In September 2010, Lawhead received a verbal warning for running a yellow light. (*Id.* at Ex. 15.) He received another verbal warning in May 2011 for "going through a yellow/red light." (*Id.*) In March 2012, he was given a third verbal warning for tardiness. (*Id.*) In January 2013, Lawhead received a written warning for causing an accident when he hit a car while

making a turn. (*Id.*)  In February 2013, he was placed on probation after texting and talking on a

cell phone while driving a bus with passengers. (*Id.*)  Davis testified at her deposition that

Lawhead was again caught talking on his cell phone while driving a bus in April 2013 (Davis

Dep. 523-25), but both she and Rarick later deny this in their affidavits, asserting that Davis was

mistaken at her deposition (Davis Aff II ¶ 5; Rarick Aff. II ¶ 8).[20] *See Cent States, S.E. & S.W.*

*Area Pension Fund v. Neiman*, No. 99 C 1181, 2000 WL 320285, at *6 (N.D. Ill. Mar. 24, 2000)

("When a deposition and an affidavit are in conflict, the deposition testimony trumps the

affidavit, unless it is demonstrable that the statement in the deposition was mistaken.").

Lawhead struggled with health problems in 2013 and eventually resigned. (Davis Aff. II ¶ 6.)

4. <u>Timothy Harpel</u>

In January 2001, Harpel was given a written notice that he needed to improve his "people

management skills"; the notice gave him specific guidelines to follow for student management.

(Pl.'s Designation of Materials Ex. 25.)  In October 2002, he was involved in an accident. (*Id.*)

In September 2005, Harpel was again counseled about his student management skills and given

guidelines to follow for student safety. (*Id.*)  In November 2005, Harpel had an accident and was

given a written warning for failing to focus on his driving. (*Id.*)  In an evaluation that same

month, it was noted that some students were riding unsafely; the evaluation instructed Harpel to

provide to Doll his guidelines for student management by December 2005 and that Doll would

review a tape from his bus to see how he was managing students. (*Id.*)

Harpel's evaluation in February 2009 stated that he needed to make sure that all students

---

[20] Billings does not point to any disciplinary document of record to support Lawhead's supposed April
2013 violation.

were secure before moving the bus. (*Id*.) In November 2009, Rarick put Harpel on probation after he was cited by a police officer for failing to stop at a stop sign. (*Id*.) In February 2012, a parent complained that Harpel made an insensitive comment about her special needs child. (*Id*.) In September 2012, a female employee complained that Harpel was sexually harassing her; he was given a written warning and instructed to remain on his bus and limit all communication with her. (*Id*.) Harpel remains employed with SACS. (*Id.*)

Although Patane, Good, Lawhead, and Harpel each had the same supervisor, were subject to the same rules, and had significant disciplinary histories, SACS contends that they are not similarly-situated to Billings. Specifically, Davis stated that SACS views accidents less seriously because they are "honest errors," in contrast to Billings's willful failure to write up her students for standing on the bus, which amounted to insubordination. (*See* Davis Dep. 5 ("I think accidents are just that, they're accidents . . . . Willful disobedience rises to a level beyond that.").) Rarick and Davis further contend that Billings's statements in their meeting with her in March 2011 "completely undermined their confidence in her ability to become a successful driver" and led them to conclude that she was unlikely to change, particularly since Rarick had counseled her just six months earlier on the same issue. (Reply 13.) They argue that all of Billings's potential comparators improved their performance after deficiencies were brought to their attention.

But SACS's argument that the four comparators improved their performance after deficiencies were brought to their attention is defied by the record. After Patane had his third accident in February 2011 due to a "lack of concentration," SACS warned him that his "safety management in operating a school bus must reflect immediate improvement and remain

25

satisfactory [t]hereafter, in order to avoid further disciplinary actions up to and including termination." (Pl.'s Designation of Materials Ex. 14.)  But later that year, Patane had his fourth accident and then drove the bus without asking the mechanics to inspect it; SACS merely repeated the same warning it had given him in February. (*Id.*)  Then, just four months after that, Patane had his *fifth* accident due to a "lack of focus" and again drove the bus without asking the mechanics to inspect it; yet, SACS retained his employment. (*Id.*)  Similarly, Good had an accident in early May 2011 due to a "lack of concentration," and SACS gave her the same warning that Patane received. (*Id.* at Ex. 16.)  But within two weeks, Good had *another* accident, this time with student injuries; and she failed to report it and check passengers for injuries. (*Id.*)  SACS also retained her employment. (*Id.*)

Thus, contrary to SACS's characterization, Patane and Good did not improve the first time an issue was brought to their attention, even when a warning of termination was associated with the matter.  Here, Rarick's November 2010 memo to Billings after she called him out to her bus gave no such warnings of termination.  In fact, Billings did not even perceive that she had done anything wrong at the time or that she was being disciplined, since she had followed SACS's procedure by calling Rarick out to assist her. (Billings Aff. ¶¶ 51, 57.)

And SACS's attempt to minimize other drivers' accidents as "honest errors" and magnify Billings's failure to write up students as "insubordination" also does not square.  SACS states that its bottom-line concern is its students' safety, emphasizing that had it "retained [Billings's] employment and a student suffered an injury due to standing while the bus was moving, SACS would have had great difficulty explaining why it retained a driver with multiple serious and willful safety violations." (Def.'s Br. in Supp. 17).  But the comparators *had* repeated accidents,

some with student injuries. As a result, SACS is having "great difficulty" explaining why it retained these comparators, who had repeated disciplinary violations *and* accidents, but not Billings, who had similar disciplinary violations but a clean driving record.

At the end of the day, for purposes of determining comparators, "precise equivalence in culpability between employees is not the ultimate question." *Donahoe*, 667 F.3d at 850 ("Comparators must have engaged in similar—not identical—conduct to qualify as similarly situated."). The Court is "not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct." *Gordon v. United Airlines, Inc*., 246 F.3d 878, 891 (7th Cir. 2001). Here, for purposes of summary judgment, these comparators are similar enough to permit a reasonable inference of retaliation, and that is all that is required. *See Coleman*, 667 F.3d at 852.

b. Ambiguous Statements

Next, Billings points to an ambiguous statement made by Rarick to Ruch at the start of the school year following Billings's termination. When Ruch complained to Rarick that he was still being harassed by other drivers, Rarick responded that he "thought this all stopped last year." (Ruch Aff. ¶¶ 24-25.) Ruch later made a second complaint of harassment, and Rarick again responded: "[T]his was supposed to be cleared up last year." (Ruch Aff. ¶¶ 27.) It would be reasonable to conclude from this statement, when viewed as a whole with the other circumstantial evidence, that Rarick, growing weary of Billings's repeated complaints of sexual harassment, thought that he could squelch all complaints of harassment by terminating Billings.

Any ambiguity in statements must be read in Billings's favor. *See Long v. Teachers' Ret. Sys. of State of Ill.*, 566 F. Supp. 2d 851, 860 (C.D. Ill. 2008). "It would be reasonable to

conclude that [Rarick's] statement is evidence 'pointing directly to the discriminatory reason for the employer's action.'" *Coleman v. Robinson Bros. Envtl., Inc*., Nos. 06-C-0492-C, 06-C-0493-C, 2007 WL 5576554, at *5 (W.D. Wis. July 9, 2007) (citing *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). "While it may be possible to interpret the conversation differently, interpretation is for trial and not for summary judgment. *Id*. ("[T]he tasks of disambiguating ambiguous utterances is for trial, not for summary judgment." (quoting *Shager v. Upjohn*, 913 F.2d 398, 402 (7th Cir. 1990))).

Moreover, there is the "Verbal Warning" memo that Rarick wrote for Billings's file in October 2010—just one month after her September 2010 complaint of "sexual harassment"—belatedly documenting Doll's conversation with her months earlier about sitting on the dash of Ruch's bus. (Rarick Dep. 203-04, Ex. 10; Billings Aff. ¶ 52.) At his deposition, Rarick could not recall how he knew about Doll's and Billings's discussion, but thought it was possible another driver told him. (Rarick Dep. 204.) A reasonable jury could infer that Rarick's belated documentation of a conversation that he did not witness was an effort to pad Billings's file in preparation for her termination. *See generally Narbaiz v. TCF Fin. Corp*., No. 08 C 17, 2009 WL 1346246, at *1 (N.D. Ill. May 8, 2009) ("The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.").

In that same vein, Rarick met with Billings in September 2010 to remind her she was still on probation. But there is no evidence he did the same with other employees who were on probation. Rarick then wrote a memo to Billings documenting their discussion, but never gave her a copy and instead placed it in her file.

c. Pretext

"An inquiry into pretext requires that [the Court] evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). Rarick and Davis said that they fired Billings because she failed to write up students for standing up on her bus. But drivers commonly had problems with students standing on the bus. (Billings Aff. ¶ 66; Kuschel Aff. ¶¶ 14, 16; Ruch Aff. ¶¶ 15-16; Good Aff. ¶ 15; Reinking Aff. ¶¶ 5-6, 10.) The record evidences that drivers did not write up every student they saw standing—and that Rarick was well aware of this—because it simply "would not be practical," as drivers would be writing incident reports every day. (Billings Aff. ¶ 61; Kuschel Aff. ¶ 14; Ruch Aff. ¶ 17.) In fact, Rarick regularly came out and watched the buses leave or arrive at the schools and thus would know that students stood on the buses.[21] (Billings Aff. ¶ 62; Kuschel Aff. ¶ 15; Ruch Aff. ¶ 16; *see* Good Aff. ¶ 14; Reinking Aff. ¶ 10.) Rarick also rode along with drivers during evaluations and would see students stand up. (Billings Aff. ¶ 62.)

Indeed, there is no evidence that SACS terminated any other driver for failing to discipline students for standing up on the bus. (Billings Aff. ¶¶ 67-68; Kuschel Aff. ¶ 13; Ruch Aff. ¶ 19; Good Aff. ¶ 16; Reinking Aff. ¶ 12); *see Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) (explaining that a plaintiff can demonstrate pretext by showing the employer's proffered reason is "insufficient to motivate the discharge"). In fact, Good, who took over Billings's bus in May 2011, wrote up numerous students for unruly behavior and turned them in to Rarick, but only in one instance that she was aware of—when a student screamed at

---

[21] Rarick states, however, that he did not randomly view bus videos and when he came out and watched the buses arrive or depart from the schools, he never saw rampant standing of students while buses were moving. (Rarick Dep. 43-44, 83-84; Rarick Aff. II ¶ 6.)

her—did SACS ever take any action. (Good Aff. ¶ 10.)  Good, in fact, pleaded with Rarick several times to ride her bus to witness the disciplinary problems she was facing, but he never did. (Good Aff. ¶ 14.)

Furthermore, as explained earlier, although Rarick issued Billings a memo after she called him out to help her restore order on her bus in November 2010, it was not in the form of a written or final warning, as one would expect if it were a serious offense. (Billings Aff. ¶ 57; *see* Davis Dep. 102-07.)  In fact, the only document entitled "warning" in Billings's file in the two years preceding her termination was Rarick's memo from October 2010 belatedly documenting Doll's instruction not to sit on the dash.  A reasonable jury could infer that SACS's failure to provide Billings with any warning about termination is evidence that the real reason Billings was fired was because SACS was growing tired of her complaints of sexual harassment, *not* that she failed to write up students for standing up on the bus. *See, e.g.*, *E.E.O.C. v. N. Star Hospitality, Inc.*, No. 12-cv-214, 2013 WL 4711451, at *8 (W.D. Wis. May 9, 2013).

Furthermore, after Billings complained to Davis of "sexual harassment" in December 2007, Davis wrote on her notes to "schedule sexual harassment training," and then in January 2008 she conducted sexual harassment training.  But Davis now claims that she conducted "anti-harassment training," rather than sexual harassment training. (Davis Aff. ¶ 10; Davis Dep. 197-99); *see Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876-77 (7th Cir. 2002) (articulating that an inference of pretext may be permissible when decisionmakers make inconsistent statements about the circumstances of an employment decision).

And finally, Billings points to a lengthy email that Rarick wrote to Davis when considering whether to terminate her.  Rarick, after indicating that Billings "willfully

disregarded student safety, policy and direction most of this year," went on to state:

> Her actions on other matters have helped to split the attitude of [my] driving staff—she has done this over the years. Many would point to this driver as the reason for low moral [sic]. . . . By some accounts (office staff, some drivers, bus committee . . . [)], she should have been let go a long time ago. Some have told me she is 'untouchable.' That gives other drivers the impression that she may do as she pleases and disregard procedure. This is the weakest point. We should focus on point number 1. [W]illful disregard of safety, policy and direction.

(Rarick Dep. 116-17, Ex. 3.) This email, first, validates Billings's complaints to SACS that her purported harassers—who made up a majority of the members of the Bus Committee—were not just spreading rumors of sexual affairs, but were also in fact trying to get her fired, just as she told Rarick. (Rarick Dep. 117-18.) Moreover, the email further suggests that SACS's stated reason of "willful disobedience" could have been just that—the *stated*, rather than actual, reason—since Rarick recognized that Billings's "actions on other matters" was his "weakest point" in support of termination.

At the end of the day, when "adjudicating claims under federal employment discrimination statutes, a court does not sit as a super-personnel department, second-guessing an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Donahoe*, 667 F.3d at 862 (citations and internal quotation marks omitted). But it "must also resist the temptation to act as jurors when considering summary judgment motions." *Id.* Here, on their own, Billings's pieces of evidence might not be enough to show a causal connection between her protected activities and her termination; together, however, they are sufficient, albeit just barely, to withstand summary judgment and create a question for the

jury.[22]

### 3. The Superintendent and the School Board Acted as the Cat's Paws of Rarick and Davis

As a final note, SACS contends that Superintendent and the School Board could not have retaliated against Billings because they were unaware of her complaints of sexual harassment when they decided to terminate her. But liability for an employment decision may be imputed to the employer if "a biased employee had a 'singular influence' over the ultimate decision maker." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). Here, the evidence shows that the initial decision to terminate a driver is made by Rarick with input from Davis. (Rarick Dep. 135-39; Davis Dep. 115-21.) The Superintendent then relied upon Davis's recommendation, and, in turn, the School Board relied upon the Superintendent's recommendation. There is no evidence that the Superintendent or the School Board conducted any investigation or independent evaluation of Billings.

Thus, on this record, the Superintendent and the Board are merely the "cat's paws" of Rarick and Davis. *See Smith v. Bray*, 681 F.3d 888, 897 n.3 (7th Cir. 2012) ("In the law of

---

[22] Billings also survives summary judgment under the indirect method of proof. As explained earlier, when viewing the facts in the light most favorable to her and affording her every reasonable inference, she has shown that she engaged in protected activity (the first prong), and there is no dispute that she suffered an adverse employment action (the third prong).

And "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . . , the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). As concluded earlier, Billings has shown that similarly-situated drivers who did not complain of sexual harassment received lesser discipline for the same, or more serious, safety violations. Therefore, Billings has established a prima facie case of retaliation.

SACS states that it terminated Billings because she knew her students were standing up on the bus and then willfully failed to implement appropriate disciplinary procedures. But Billings has produced evidence upon which a jury could infer that this reason is pretext for retaliation. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) ("Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." (internal quotation marks omitted)). As explained above, there is evidence that students standing up on buses was a common problem among drivers, that Rarick was aware of the problem and took little action, and that other drivers received lesser discipline for similar or more serious offenses.

employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (citation and internal quotation marks omitted)). Consequently, that the Superintendent and the School Board were unaware of Billings's complaints of sexual harassment when it approved her termination does not save SACS from liability. Therefore, SACS's motion for summary judgment will be DENIED, and the case will proceed to trial.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket # 31) is DENIED.

SO ORDERED.

Enter for October 17, 2013.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge